In re Laverne E. **MATHESON**, Betty A. **Matheson**, Debtors.

B. J. **BAUGH**, Terry Barr, Cecil Miller, J. Larry Walters, A. W. Compton, C. C. Mitchell, John H. Chambers, III, Plaintiffs,

v.

Laverne E. **MATHESON** and Betty A. **Matheson**, Individually and d/b/a Linden Stockyards and L & P Food Company and Columbia Cattle Company, Defendants.

Bankruptcy No. 80–00586.
Adv. No. 80–0345.

United States Bankruptcy Court,
S. D. Alabama.

April 14, 1981.

2. This could be construed as reopening the bidding.

W. W. Dinning, Lloyd, Dinning & Boggs, Demopolis, Ala., for plaintiffs.

William T. Faile, Selma, Ala., for defendants.

## ORDER

GORDON B. KAHN, Bankruptcy Judge.

At Mobile in said District on the 14th day of April, 1981, before Gordon B. Kahn, Bankruptcy Judge:

This matter having come on for hearing on the Complaint to Determine Dischargeability of Debt of B.J. Baugh, Terry Barr, Cecil Miller, J. Larry Walters, A. W. Compton, C. C. Mitchell and John H. Chambers, III, and upon the Answer of the Debtors herein and due notice of said hearing having been issued; and Mr. W. W. Dinning having appeared as attorney for the Complainants and Mr. William T. Faile having appeared as attorney for the Debtors; now upon said Complaint and Answer and the evidence presented, the Court FINDS, CONCLUDES and ORDERS as follows:

## FINDINGS OF FACT

1. The Debtors purchased the Linden Stockyards, Linden, Alabama, from the Ken Murray Corporation and operated the stockyards from April 1, 1979 until May, 1980.

2. The Linden Stockyards were subject to the provisions of Chapter 9, 7 U.S.C. § 181 *et seq.* by virtue of action of the Secretary of Agriculture according to 7 U.S.C. § 202(a) and (b).

3. Pursuant to the rules and regulations governing stockyards and market agencies as defined in Chapter 9, *supra*, the Debtors maintained several bank accounts in the operation of their business.

4. The Debtors specifically maintained an operating account, a trading account and a custodial account.

5. Pursuant to 7 U.S.C. § 204 and 9 CFR 201.29 the Debtors obtained bonding from Aetna Casualty and Surety Company (Aetna).

6. Nine persons, seven of whom are complainants herein, agreed to indemnify Aetna for all damages, loss, costs, etc., sustained or incurred as a consequence of payment having to be made by Aetna on the bond.

7. The Department of Agriculture audited the Debtors' accounts as of April 29, 1980, and as of May 31, 1980. The April 29, 1980, audit revealed a deficit of $50,930.69 in the custodial account. The May 31, 1980, audit revealed a net deficit of $37,820.32 in the custodial account.

8. In the opinion of the auditor, either funds or disbursements from the custodial account were not made for payment to livestock consignors or the account was never reimbursed for uncollected funds.

9. The custodial account was handled by the Debtors or a bookkeeper in the Debtors' employ so that funds which should have

been deposited in the custodial account were used for the debtors' operating expenses.

10. Fourteen consignors who failed to receive payment for livestock handled by the Linden Stockyards filed proofs of claim totalling $27,151.24 with the United States Department of Agriculture.

11. The United States Department of Agriculture notified the State of Alabama, Department of Agriculture and Industries, which then made claim upon Aetna as obligee on Debtors' bond.

12. Aetna notified the indemnitors, complainants herein, of the claim and requested fulfillment of their obligation as indemnitors.

13. The indemnitors have not paid the debt due Aetna.

14. The complainants have filed proofs of claim in their own names in the amount of $27,151.24.

15. Aetna has not filed a proof of claim in this case.

## CONCLUSIONS OF LAW

This adversary proceeding is brought in conjunction with the claims filed by complainants and challenges the dischargeability of the debt due Aetna upon which the complainants are guarantors and upon which they have been called upon to pay.

Under Section 501(b), Bankruptcy Code, as follows:

"If a creditor does not timely file a proof of such creditor's claim, an entity that is liable to such creditor with the debtor, or that has secured such creditor, may file a proof of such claim."

The Legislative History offers this explanation:

.     .     .     .     .

"Subsection (b) permits a codebtor, surety, or guarantor to file a proof of claim on behalf of the creditor to which he is liable if the creditor does not timely file a proof of claim.

... The purpose of this subsection is mainly to protect the debtor if the credi-

tor's claim is nondischargeable. If the creditor does not file, there would be no distribution on the claim, and the debtor would have a greater debt to repay after the case is closed than if the claim were paid in part or in full in the case or under the plan."

House Report No. 95–595, 95th Cong., 1st Sess. (1977) 351, U.S.Code Cong. & Admin.News 1978, 5787, 6307; Senate Report No. 95–989, 95th Cong., 2d Sess. (1978) 61, U.S.Code Cong. & Admin.News 1978, 5787, 5847.

Subsection (b), Section 501, Bankruptcy Code, supersedes portions of Rule 304, Bankruptcy Rules. *See*: Comment to Rule 304, 1978 Bankruptcy Code, Matthew Bender & Company, Inc., 1979, p. 137.

Rule 304. *Claim by Codebtor.*

"A person who is or may be liable with the bankrupt, or who has secured a creditor of the bankrupt, may, if the creditor fails to file his claim on or before the first date set for the first meeting of creditors, file a proof of claim pursuant to Rule 302 in the name of the creditor, if known, or, if unknown, in his own name ..."

Both Rule 304 and Section 501 give one who is or may be liable to a creditor of the debtor the right to file a claim in the creditor's name if the creditor has not filed a claim. The claim must be filed in the name of the original creditor to avoid duplication of payment.

*In the Matter of Keith LeRoy Welsh*, 1 BCD 1411 (W.D.Wis.1975) the Court allowed a claim filed in the name of the guarantors of the debt even though the guarantors knew the name of the creditor bank. The Court relied upon the underlying purpose of Rule 304 which was to provide relief to this class of creditor.

The complainants argue that the debt due Aetna is nondischargeable under Sections 523(a)(2), 523(a)(4) and 523(a)(6) of the Bankruptcy Code. The Debtors contend that the complainants have failed to show evidence of injury, fraud, wrongdoing, larceny or embezzlement committed by them.

Since this Court believes that the case can be decided on Section 523(a)(4), Bankruptcy Code, discussion of the other sections relied upon in pretermitted.

According to Section 523(a)(4), Bankruptcy Code:

"A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;"

Pursuant to 7 U.S.C. § 202, the Debtors had been notified by the United States Department of Agriculture that they were a stockyard as defined in 7 U.S.C. § 202(a), and consequently under 7 U.S.C. § 202(b) the Linden Stockyards became subject to all provisions of Chapter 9, 7 U.S.C. 181 *et seq.* (Packers and Stockyards Act).

Section 228, Title 7, U.S.C., empowers the Secretary of Agriculture to promulgate rules and regulations necessary to carry out the provisions of Chapter 9. This authority is reflected in 9 CFR 201, *et seq.* Specifically, 9 CFR 201.42 is applicable here:

Sec. 201.42. *Custodial accounts for trust funds*

"(a) *Payments for livestock or poultry purchases are trust funds.* Each · payment made by a livestock or poultry buyer to a market agency or licensee is a trust fund until such market agency's or licensee's custodial account has been paid in full in connection with such purchase and funds deposited in custodial accounts are also trust funds. This is the case under either the net proceeds or gross proceeds method of maintaining the custodial account referred to in paragraph (c) of this section.

(b) *Market agencies and licensees required to establish and maintain custodial accounts.* Every market agency and licensee engaged in selling livestock or live poultry on a commission or agency basis shall establish and maintain a separate bank account designated as 'Custodial Account for Shippers' Proceeds,' or by some similar identifying designation, under terms and conditions with the bank where established, to disclose that the depositor is acting as a fiduciary with respect thereto and that the funds in the account are trust funds.

(c) *Deposits in Custodial Accounts.* Before the close of the next banking business day after consigned livestock or live poultry is sold, the market agency or licensee shall deposit in its custodial account the proceeds from the sale of consigned livestock or live poultry that are collected or received on the day of sale, and an amount equal to the proceeds receivable from the sale of consigned livestock or live poultry that are due from (1) the market agency or licensee; (2) any owner, officer, or employee of the market agency or licensee; or (3) any buyer to whom the market agency has extended credit. On or before the third day following the sale of consigned livestock or live poultry (or the next banking business day after the third day if such third day is a non-banking business day), the market agency or licensee shall deposit in the custodial account an amount equal to all the proceeds receivable from the sale of consigned livestock or live poultry, whether or not such proceeds have been collected or received by the market agency or licensee in lieu of the foregoing, any market agency or licensee may adopt, and thereafter continuously follow a 'net method' for making deposits in its custodial account. Under the 'net method' the market agency or licensee shall, before the close of the next banking business day after livestock or live poultry is sold, deposit an amount equivalent to the proceeds of the sale of consigned livestock or live poultry less marketing charges due the market agency or licensee.

(d) *Withdrawals from custodial accounts.* The custodial account referred to in paragraph (b) of this section shall be drawn on only for payment of the net proceeds to the consignor or shipper, or such other person or persons who the market agency or licensee has knowledge is entitled thereto, to pay all legal charges against the consignment of livestock or live poul-

try which the market agency or licensee may, in its capacity as agent, be required to pay for and on behalf of the consignor or shipper, and when the account is not kept on a net proceeds basis, to obtain therefrom the sums due the market agency or licensee as compensation for its services."

9 CFR 201.42 clearly expresses the intent of the Secretary of Agriculture to place the stockyard owner, market agent and/or dealer in a fiduciary position by declaring that funds received as payment for livestock sold are a trust fund and that such funds are to be maintained in an account designated as a custodial account. *Mahon v. Stowers*, 416 U.S. 100, at p. 108; 94 S.Ct. 1626, 40 L.Ed.2d 79 (1974); *Smeed v. Carpenter*, 274 F.2d 414 (9th Cir. 1960); *Hyatt v. United States*, 276 F.2d 308 (10th Cir. 1960).

In order for a debt to be nondischargeable under Section 523(a)(4), Bankruptcy Code, as noted above, the Debtor must have committed fraud, defalcation, embezzlement or larceny while acting in a fiduciary capacity.

Neither the Legislative History, Comment, nor current jurisprudence concerning Section 523(a)(4), Bankruptcy Code, reveal Congressional intent as to the interpretation to be given to the word "defalcation."

The predecessor of Section 523(a)(4), Bankruptcy Code, is Section 17(a)(4), Bankruptcy Act:

"Sec. 17. *Debts Not Affected by a Discharge.* a. A discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowable in full or in part, except such as . . . (4) were created by his fraud, embezzlement, misappropriation or defalcation while acting as an officer or in any fiduciary capacity; . . ."

The difference between Section 17(a)(4), Bankruptcy Act, and Section 523(a)(4), Bankruptcy Code, is merely one of form. One of the results obtained in both is the nondischargeability of a debt created by defalcation while acting in a fiduciary capacity. It is therefore appropriate to consider the authorities relating to Section 17(a)(4), Bankruptcy Act, to determine the meaning of "defalcation" as used in Section 523(a)(4), Bankruptcy Code.

In *Central Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510 (2d Cir. 1937), "defalcation" was placed in its historical context, without limiting the meaning to specific parameters. The Court rejected the notion that defalcation necessarily implies an embezzlement, fraud or misappropriation. While a defalcation may involve some misconduct, the Court concluded that the mere taking of money entrusted to a fiduciary is a defalcation. However, the Court further reiterated the position taken in *In re Bernard*, 87 F.2d 705 (2d Cir. 1937) that the act must be more than mere negligence or mistake.

The district court in *Matter of Kawczynski*, 442 F.Supp. 413 (W.D.N.Y.1977) further reasoned that the meaning of defalcation in *Central Hanover Bank & Trust Co. v. Herbst, supra,* included "innocent defaults" and found that a diversion of funds held in trust for paying a supplier and a subcontractor to pay general business expenses created a debt that was not dischargeable in bankruptcy.

In *Carey Lumber Company v. Bell*, 615 F.2d 370 (5th Cir. 1980) the Fifth Circuit questioned the continued validity of the dicta in *In re Bernard, supra,* that misappropriation may *not* be found on the basis of "mere negligence or mistake." Specifically, the Court concluded at p. 316 that,

"Thus there is no requirement that a misappropriation must be shown to have been intentional in order to be covered by Section 17(a)(4)."

The Court further rejected the contention "... that misappropriated funds must be shown to have been diverted by the bankrupt to his own use". At p. 376.

It is the mere act of using the trust fund for any purpose other than the purpose for which the trust was created that constitutes misuse or misappropriation of the trust fund which is a defalcation committed by the fiduciary.

In this case, the purpose of the trust was enumerated in 9 CFR 242.02, as noted above. According to Subsection (d), withdrawals from the custodial account are to be made solely to pay the consignors and costs associated with the sale and handling of the livestock. Debtors admittedly used funds from the custodial account for operating expenses. This was a direct violation of 9 CFR 242.02 and was a breach of Debtors' fiduciary duty to the consignors. But for this act, the custodial account would have remained intact, there would have been no complaint by the consignors for payment upon Debtors' bond and consequently no demand made upon the guarantors for payment by the surety.

Debtors argue that it was not them, but an employee or some unknown person, who was responsible for the irregularities in the custodial account. The following provision of 7 U.S.C. answers Debtors' argument:

Sec. 223. *Responsibility of principal for act or omission of agent*

"When construing and enforcing the provisions of this chapter, the act, omission, or failure of any agent, officer, or other person acting for or employed by any packer or any live poultry dealer or handler, stockyard owner, market agency, or dealer, within the scope of his employment or office, shall in every case also be deemed the act, omission, or failure of such packer or any live poultry dealer or handler, stockyard owner, market agency, or dealer, as well as that of such agent, officer, or other person."

Whether the act was committed by the Debtors or their agent is immaterial. The fact remains that trust funds were improperly used while the Debtors were trustees of the fund. The debt created; namely, the $27,151.24, which was ultimately paid by Aetna is nondischargeable.

## ORDER

Now therefore, it is ORDERED, ADJUDGED and DECREED that the debt in the amount of $27,151.24 created by Debtors' use of custodial funds for operating expenses be and it hereby is declared NON-DISCHARGEABLE; FOR THE RECOVERY OF WHICH LET EXECUTION ISSUE.